IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**RAFAEL SIERRA-PASCUAL,**
a/k/a Lito MC Cassidy

    **Plaintiff,**

    v.

**PINA RECORDS, INC. et al.,**

    **Defendants.**

Civil No. 08-1114 (GAG/BJM)

**OPINION AND ORDER**

Plaintiff Rafael Sierra-Pascual a/k/a Lito MC Cassidy ("Sierra") filed this action, alleging copyright infringement through the unauthorized publication and distribution of the song "Noche Triste." Co-defendant Rafael Pina-Nieves ("Pina") moves for partial summary judgment and requests the dismissal of plaintiff's action for lack of subject matter jurisdiction. After reviewing the pleadings and pertinent law, the court **DENIES** co-defendant Pina's motion for summary judgment (Docket No. 41).

**I.**    **Standard of Review**

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. The nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the

court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party (here, the plaintiff) and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

## II.   Factual & Procedural Background

Plaintiff Sierra is a recording artist who is known by the artistic name of "Lito MC Cassidy." Co-defendant Pina is the chief executive officer and/or owner of co-defendant RAP Records, Inc., also d/b/a Pina Records, Inc. ("Pina Records"). According to the complaint, in 1999 Sierra and his then-partner, Rafael Polaco-Molina, signed an exclusive recording contract with Pina Records, owned at the time by co-defendant Pina's father, Rafael Pina-Gomez. Upon Pina-Gomez's passing in 2000, Sierra agreed to continue recording with Pina Records, under the same terms and conditions. After said contract expired in 2004, Sierra continued to collaborate with Pina Records.

At some point between 2005 and 2006, Sierra and Pina Records artist Kenny Vazquez ("Vazquez"), artistically known as "Ken-Y," recorded the song "Noche Triste" in Sierra's private studio. In his deposition, Sierra referred to his recording with Vazquez as a collaboration between partners from the same company. Sierra also testified that he wrote the lyrics to the song and hired Rafael Cardona ("Cardona"), artistically known as "D.J. Rafo," to compose the music. Co-defendant Pina argues that Sierra's deposition testimony suggests a different version of events: that Sierra gave a recording of the a capella lyrics to an Omar Rodriguez, so that he and another individual by the name of Joel Cruz would find a producer to compose the music. (See Docket No. 42-3.) Nonetheless, the work-for-hire agreement, dated August 23, 2006, states that Rompecuello Records, Inc., a company owned by Sierra, shall be considered the author and sole owner of Cardona's

**Civil No. 08-1114 (GAG/BJM)**               3

intellectual property as regards the song "Noche Triste," which would be published in an album tentatively titled "Il Capo di Tutti Capi."

After this initial recording, the song was released on the internet. Sierra testified that Pina was unhappy with him upon hearing "Noche Triste," for having recorded a song with one of his artists without his permission. When the song became popular, however, Pina asked Sierra if he would come to Pina Records and re-record the song with Vazquez because he did not like the quality of the sound recording. Sierra agreed, and the song was recorded once more. According to Sierra's deposition testimony, in this second recording the original beat was re-mixed and mastered, with "maybe one or two instruments" added, but the lyrics to the song remained the same. (Docket No. 48-3 at 7.) Subsequently, Pina released the new version of "Noche Triste" to radio stations, with Sierra's consent. Sierra also agreed to take part in a music video, using the sound recording prepared at Pina Records. Thus, Sierra voluntarily participated in both the re-recording and the music video, which were paid in full by Pina Records.

The parties profered a Certificate of Registration issued by the United States Copyright Office in which plaintiff Sierra appears as the author of the music and lyrics for "Noche Triste." According to this document, the effective date of registration was October 10, 2006. At some point in 2006 –apparently after Sierra filed for copyright protection–, "Noche Triste" was released for sale by Pina Records in an album titled "Masterpiece." The song was also performed on multiple occasions by Vazquez, allegedly without Sierra's consent. Sierra testified that when he agreed to re-record the song and appear in the music video, he thought those materials would only be used as promotional tools, and not for sale as part of an album. In his answer to interrogatories, Sierra alleges that he insisted on this point, stating that "[he] would go along only if the song were released for promotional purposes only, and that it would only be published on [his] next album." (Docket No. 48-6 at 4.) In contrast, Pina asserted in his deposition that he had authorization from Sierra to use his recordings or vocal performances in the release of the song "Noche Triste," and "that was the same song that was included as a bonus track in the Masterpiece album." (Docket No. 51-2 at 3.) As to the authorship of "Noche Triste," Pina also testified that the song had actually been composed by the artistic group known as "Los Magnificos," which comprised, among others, Pina,

**Civil No. 08-1114 (GAG/BJM)**                              4

Sierra, Cardona, and Ken-Y.

Sierra filed suit against Pina, Pina Records, Universal Music Latino, Universal Music Distribution Corp., and other unnamed defendants, for the violation of his exclusive rights under the Copyright Act, 17 U.S.C. § 1101, by publishing, synchronizing with images, and distributing the song "Noche Triste" without Sierra's consent. (See Amended Complaint, Docket No. 3.) Co-defendant Pina now moves for summary judgment (Docket No. 41), which motion was timely opposed by the plaintiff (Docket No. 48).

**III.   Discussion**

Co-defendant Pina argues that (1) the court lacks subject-matter jurisdiction because the plaintiff's copyright registration is invalid, (2) the plaintiff granted the defendants an implied, non-exclusive license to publish the song in Pina Records' next album, and (3) the plaintiff is estopped by his own acts from bringing a copyright infringement action against defendants. The court will address each of the co-defendant's arguments in turn.

   **A.   Copyright Registration**

Title 17 of the United States Code, which governs copyrights, provides in section 411 that "no action for infringement of the copyright in any United States work shall be instituted until preregistration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). The First Circuit of Appeals has held that this rule is jurisdictional. See Torres Negron v. J & N Records, LLC, 504 F.3d 151, 156 (1st Cir. 2007) (collecting cases). "[A]lthough copyright protection attaches the day original expression is fixed in a tangible medium, and thus an infringer may be liable for infringement from that day forward, registration of the copyright is a prerequisite to suit under the Copyright Act." Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1160 (1st Cir. 1994) (citiations omitted).

Pina alleges that the court lacks subject-matter jurisdiction because Sierra's copyright registration is invalid. He argues that Sierra made material misrepresentations to the Copyright Office in his application for registration of the copyright, to wit, that he was the sole author of the song "Noche Triste." His contention is that "Noche Triste" was composed by the group known artistically as "Los Magnificos," which included Sierra, Cardona, Vazquez, and co-defendant Pina,

**Civil No. 08-1114 (GAG/BJM)**                        5

and that Sierra failed to explain these facts in his application. Pina also points out that, though Sierra claims to have written the lyrics to the song and then hired Cardona to compose the music, Sierra's application for copyright registration made no mention of this "work for hire" agreement.

As pointed out by Sierra, although inaccuracies in a copyright registration may bar actions for infringement under the Copyright Act, "immaterial, inadvertent errors in an application for copyright registration do not jeopardize the validity of the registration." Data Gen. Corp., 36 F.3d at 1161. "In general, an error is immaterial if its discovery is not likely to have led the Copyright Office to refuse the application." Id. "Mistakes such as an incorrect date of creation or failure to list all co-authors easily qualify as immaterial because the Copyright Office's decision to issue a certificate would not be affected by them." Torres-Negron, 504 F.3d at 158 (citing Data Gen. Corp, 36 F.3d at 1163) (stating that inadvertant failures to list preexisting works or coauthors are encompassed by the rule excusing immaterial mistakes)). However, "where a plaintiff's registration was procured through fraud . . . the registration becomes invalid and the courts lack jurisdiction over the case." Id. at 162; see also 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 7.20, at 7-201 ("[A] misstatement or clerical error in the registration application, if unaccompanied by fraud, should neither invalidate the copyright nor render the registration certificate incapable of supporting an infringement action . . . If the claimant wilfully misstates or fails to state a fact that, if known, might have caused the Copyright Office to reject the application, then the registration may be ruled invalid.").

Here, Pina's argument is that the plaintiff misstated his ownership over the copyright in the application for registration (1) because he did not specify that he gained complete ownership over the song through a work-for-hire agreement and/or (2) because he knew he could not attribute sole authorship to himself, having collaborated with "Los Magnificos" during the song's recording. Under the controlling jurisprudence, these misstatements only jeopardize the validity of the registration if they would've been material to the Copyright Office's determination to issue the certificate, or if there is a finding of fraud or intentional misrepresentation. See Torres-Negron, 504 F.3d at 158.

Copyright ownership under the Copyright Act "vests initially in the author or authors of the

**Civil No. 08-1114 (GAG/BJM)**                            6

work." 17 U.S.C. § 201(a). Sierra has correctly pointed out that "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of [the Copyright Act], and . . . owns all the rights in the copyright." 17 U.S.C. § 201(b). Thus, although, "as a general rule, the author is the party who actually creates the work . . . [t]he Act carves out an important exception . . . for 'works made for hire.'" Comm. for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989). "If the work is for hire, 'the employer or other person for whom the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary." Id. (quoting 17 U.S.C. § 201(b)). In this case, Sierra and Cardona entered into an agreement wherein Cardona expressly agreed that his composition of the music for "Noche Triste" would be done as a work for hire (see Docket No. 48-4 at 1). This agreement predates the certificate of copyright issued by the Copyright Office by two months (see Id. at 2; Docket No. 42-5). Therefore, assuming the validity of the work for hire agreement between Sierra and Cardona, by the time Sierra applied for registration with the Copyright Office, he had become the author "for purposes of [the Copyright Act], and own[ed] all the rights in the copyright." 17 U.S.C. § 201(b). That being the case, the inclusion of the work for hire agreement in his application for copyright registration "is not likely to have led the Copyright Office to refuse the application." Torres-Negron, 504 F.3d at 158. Consequently, Sierra's misstatement in this regard cannot invalidate his copyright registration.

Pina's alternative argument – that Sierra had the obligation to disclose that the song was a collaborative work by "Los Magnificos" as a group– also falls short of rendering Sierra's copyright registration invalid. In essence, Pina is arguing co-authorship as a defense to the copyright infringement claim. The Copyright Act specifically recognizes that more than one person may be attributed authorship to a particular work. It defines "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. A co-authorship claimant bears the burden of establishing that each of the putative coauthors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors whose respective contributions would be merged into a joint work. C&C Entertainment, Inc. v. Rios-Sanchez, 208 F. Supp. 2d 139, 142 (D.P.R.

**Civil No. 08-1114 (GAG/BJM)**                    7

2002) (citing Thomson v. Larson, 147 F.3d 195 (2nd Cir. 1998) (citing Childress v. Taylor, 945 F.2d 500, 505 (5th Cir. 1991) (establishing "the test"))); see also Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.M.b.H. & Co. Kg., 510 F.3d 77, 88 (1st Cir. 2007).

With regard to the first element of the test for joint authorship, an author's contribution is independently copyrightable if the contribution "represents original expression that could stand on its own as the subject matter of copyright," Erickson v. Trinity Theater, Inc., 13 F.3d 1062, 1069 (7th Cir. 1994) (citation omitted). In other words, if it is an "original work . . . fixed in a tangible medium of expresion." 17 U.S.C. § 102.[1] A work of authorship is considered "original" if the work is independently created by the author, and it possesses at least some minimal degree of creativity. CMM Cable Rep, Inc., v. Ocean Coast Properties, Inc., 97 F.3d 1504, 1516 (1st Cir. 1996); Cabrera v. Teatro del Sesenta, Inc., 914 F. Supp. 743, 762 (D.P.R. 1995).

In the present case, Pina's argument of co-authorship is based on the blanket statement that "[t]he music of 'Noche Triste' was composed by a group artistically known as 'Los Magnificos' which members included Cardona, Kenny Vazquez, and co-defendant Rafael Pina." (Docket No. 41.) However, there is no evidence on the record, nor any allegations, as to the extent of participation that each of the members had in the creation of the sound recording and/or musical composition at issue in this case, so as to allow the court to determine whether Pina provided original expression, independently subject to copyright protection. Though, "[t]here is little question but that a performer's rendition of a work written by another may in itself constitute an original work," 1-2 Nimmer on Copyright § 2.10[A][2][a], if the producer's only basis for claiming original contribution were the act of "setting up the recording session," it would be ill-based. Forward v. Thorogood, 985 F.2d 604 (1st Cir. 1993) (holding that producer who arranged and paid for recording sessions was not co-author). "This is no more an act of 'authorship' than it is the act of one who makes available to a writer a room, a stenographer, a typewriter, and paper." 1-2 Nimmer on

---

[1] The Copyright Act specifically includes musical works as one such category of original work. 17 U.S.C. § 102. Sound recordings are also included in the Act, as distinguishable from the underlying musical composition. Id.; 1-2 Nimmer on Copyright § 2.10.

**Civil No. 08-1114 (GAG/BJM)**                                8

Copyright § 2.10[A][2][b]. On the other hand, a producer who engages in artistically supervising and editing the production might very well have sufficient basis for a claim of original contribution in the sound recording. See Forward, 985 F.2d at 60. Though the court can be fairly certain that both Sierra and Vazquez appear on the recording performing the lyrics to the song written by Sierra, it is unclear to what extent Pina or Cardona participated in this artistic production. This raises a question of material fact not susceptible to adjudication through summary judgment.

Even assuming, however, that Pina contributed original expression to the sound recording and that, therefore, the song over which Sierra claimed copyright consistuted a work of joint authorship, the court considers that this is not information that is "likely to have led the Copyright Office to refuse the application." Torres-Negron, 504 F.3d at 158. In a joint work, the joint authors hold undivided interests in a work despite any differences in the quality or quantity of each author's contribution. 17 U.S.C. § 201; see also 1-6 Nimmer on Copyright § 6.08 (2009) ("In the absence of agreement to the contrary, all joint authors share equally in the ownership of the joint work. This is true, even where it is clear that their respective contributions to the joint work are not equal.") (footnotes omitted). Each author is therefore a co-owner of the copyright. Hence, every author maintains the right to use or license the work, subject only to an accounting of any profits to the other co-owner. Erickson, 13 F.3d 1062, 1068 (7th Cir. 1994); Childress, 945 F.2d at 505. Given this legal framework, information as to co-authorship with regards to "Noche Triste" is not likely to have led the Copyright Office to deny Sierra's copyright registration. Cf. Data Gen. Corp, 36 F.3d at 1163) (stating that inadvertent failure to list coauthors is encompassed by the rule excusing immaterial mistakes).

Finally, Pina also claims that Sierra *willfully* witheld the information here at issue, a fraudulent act that would in itself invalidate the copyright registration. However, a party seeking to establish a fraud on the Copyright Office, and thereby rebut the presumption of copyright validity, bears a heavy burden, see 2 Nimmer on Copyright § 7.20[B][1] (1997). The party asserting fraud must establish that the application for copyright registration is factually inaccurate, that the inaccuracies were willful or deliberate, and that the Copyright Office relied on those misrepresentations. See Lennon v. Seaman, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000) (cited in 2

**Civil No. 08-1114 (GAG/BJM)**                                    9

Nimmer on Copyright § 7.20[B][1] (2009)); see also Whimsicality, Inc. v. Rubie's Costume Co., Inc., 891 F.2d 452, 455-56 (2d Cir. 1989) (cited in Torres-Negron, 504 F.3d at 161).  As previously stated, there are issues of material fact as to whether or not the application for copyright registration was factually inaccurate where it did not include the mention of co-authorship.  Meanwhile, given the applicable law regarding works for hire, it is not a necessary conclusion that Sierra's failure to mention how he acquired ownership over the copyrights to the musical composition "Noche Triste" was willful or deliberate, if Sierra believed he was the rightful owner of those rights prior to his application for registration.  Since co-defendant Pina offers no other proof in this respect, of willful or deliberate mistatements, the court cannot make a determination at this point that Sierra perpetrated fraud against the Copyright Office.

Therefore, the court **DENIES** summary judgment on this ground.

**B.     Implied Non-Exclusive License**

Pina next raises the defense that Sierra granted the defendants an implied, nonexclusive license to publish "Noche Triste" in Pina Record's next album.

Under the Copyright Act, the owner of a copyright has the exclusive right to copy, distribute or display his work.  See 17 U.S.C. § 106.  The owner of a copyright can transfer ownership of the copyright by selling it or by exclusively licensing it.  See id. § 101.  Exclusive licenses, however, must be in writing.  See id. § 204 (a).  Notwithstanding, while 17 U.S.C. § 204 provides that all transfers of copyright ownership, including transfers by exclusive license, must be in writing, a nonexclusive license is expressly removed from the scope of section 204 because a nonexclusive license does not amount to a "transfer" of ownership.  See 17 U.S.C. § 101; John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 40 (1st Cir. 2003).  "A copyright owner may grant such nonexclusive licenses orally, or they may be implied from conduct which indicates the owner's intent to allow a licensee to use the work.  Uses of the copyrighted work that stay within the scope of a nonexclusive license are immunized from copyright infringement suits." John G. Danielson, 322 F.3d at 40 (internal citations omitted).

However, "[t]he burden of proving the existence of such a license is on the party claiming its protection, the licensee." Id. (citing Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2nd Cir.

**Civil No. 08-1114 (GAG/BJM)** 10

1995). Moreover, "[i]mplied licenses are found only in narrow circumstances." Id. (citing Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc., 211 F.3d 21, 25 (2nd Cir. 2000) (citing Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir.1990))). In Effects Assocs., the court wrote that a nonexclusive license may arise by implication where the creator of a work at a defendant's request "hands it over, intending that defendant copy and distribute it." 908 F.2d at 558 (cited in C & C Entertainment, Inc. v. Rios-Sanchez, 208 F. Supp. 2d 139 (D.P.R. 2002)). Nevertheless, "[t]he touchstone for finding an implied license . . . is intent." John G. Danielson, 322 F.3d at 33 (citations omitted). Since a nonexclusive license does not transfer ownership of the copyright from the licensor to the licensee, the licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license. Effects Assocs., 908 F.2d at 558 n.5.

Pina argues that Sierra manifested his intent to grant him a nonexclusive license by re-recording the song and participating in the music video with knowledge that this material was going to be copied and distributed. In his deposition testimony he stated that he had "authorization for which [he] produced a video and [Sierra] participated in the video and in the final tape recording of the same - - - and that was the same song that was included as a bonus track in the Masterpiece Album." (Docket No. 51-2 at 3.) Moreover, he points out that the recording and music video were paid in full by Pina Records, with knowledge by the plaintiff, yet plaintiff never voiced an objection to the publication of either the song or the music video. On the other hand, Sierra testified in his deposition that Pina wanted to play the recording on the radio in order to promote the song and, after the song became a hit, he suggested that they make a video for the same purpose. (See Docket No. 48-3 at 7-8.) Plaintiff also testified that he believed this to be a promotional tool, both for himself and for Pina Records artist "Ken-Y," and that he did not expect Pina to publish the song in any of Pina Record's albums, since he was planning on including the song in his own upcoming record. (Id.) Plaintiff went further by stating in his answers to interrogatories that before he and the defendants undertook these endeavours, they expressly agreed that the song would not be published on any album for distribution or sale, other than Sierra's next production. (See Docket No. 48-6 at 7.) Thus, even if it could be implied from his conduct that Sierra granted Pina a nonexclusive license

to use the song "Noche Triste," a reasonable jury could still find that the license was limited to promotional uses and did not include the right to distribute the song and sell it for profit in the "Masterpiece" album.

Because there are issues of fact regarding the parties' intent, which go to a determination of the extent of any implied nonexclusive licenses, the court **DENIES** summary judgment on this ground.

**C.     Estoppel**

Finally, Pina argues that Sierra is estopped by his own actions from an infringement action against the defendants. Under Plumley v. S. Container, 303 F.3d 364, 374 (1st Cir. 2002), equitable estoppel requires the following: "(1) the party to be estopped must know the facts; (2) the party must intend that his conduct be acted upon (or must act in a way that leads the party asserting the estoppel to believe it is so intended); (3) the latter must be ignorant of the true facts; and (4) he must rely on the estopping conduct to his detriment." The court understands that there are issues of material fact as to the first and third prongs of the estoppel doctrine. As previously stated, it is unclear from the facts presently before the court whether or not Sierra knew that the song would be included in the co-defendants' album, since it is disputed that the agreement between the parties included the distribution and sale of the song. It is plausible that the parties agreed to a limited release of the song, for promotional purposes only. For this reason, it is also unclear whether or not Pina was ignorant of Sierra's true intent and proceeded to include the song in the "Materpiece" album knowing that an infringement suit would likely follow. Therefore, the court must **DENY** summary judgment on this ground.

**III.   Conclusion**

For the foregoing reasons, the court **DENIES** co-defendants' motion for partial summary jugment (Docket No. 41).

**SO ORDERED**.

In San Juan, Puerto Rico this 24th day of September, 2009.

*S/Gustavo A. Gelpí*
GUSTAVO A. GELPÍ
United States District Judge